Good morning, Your Honors. Good morning. May it please the Court. My name is Joe Price and I represent Jose Luis Nazario, an honorably discharged combat decorated Marine. We're here today because the District Court found that the Fallujah incident, what the District Court called the Fallujah incident, as opposed to even the alleged Fallujah incident, that the Fallujah incident was not service for purposes of USARA. And therefore, Mr. Nazario has not afforded the protections of USARA based on Riverside relying on those allegations of misconduct in making the decision to terminate. The District Court's position is not supported by the statute language itself, nor the two cases relied upon by the District. And that's really revealing here. With respect to the two cases relied upon, there's the Lysak case, which is a Ninth Circuit case, and there's the Smith case, which is a District case out of Mississippi. Now with respect to Lysak, what we're really talking about, the crux of this argument is, does USARA protect periods of time, does it concern periods of time, or does it concern conduct within those periods of time? Well Lysak was about a hot air balloonist who also happened to be a military reservist. The record in Lysak is clear, that the court acknowledged that there were many drill weekends, which is the reserve weekend period of time, the period of time where Mr. Lysak flew his hot air balloon for the National Guard, and that was a covered period of time. But the time in question in the case that he was terminated for, he did not have a military period of time. It wasn't a drill weekend. Essentially he decided to go fly his hot air balloon on his own, and the court said, well no, you're not covered, because that's not a covered period of time under USARA. That supports, in fact, our argument, not the District's position. The second case is arguably even more interesting. The Smith case, once again, Smith was a reservist. Smith was going to a drill weekend period of time, and decided to take the Friday off of work to, quote, unquote, get ready for his military service. And the court thought, well no, that's not military service. Getting ready is not military service. But what's interesting in Smith is the court specifically says, and I quote, obviously, the time spent on duty during an actual drill weekend constitutes the performance of military service. I mean, I appreciate the argument. I guess I have a very different conception of how the case would be resolved. It's different from the District Court's, but it's still adverse to you. So I just want to throw out my thought and hear your reaction to it. I guess I look at the statute. It talks about discrimination on the basis of service. And here I see the city saying, we didn't discriminate against you on the basis of your service. We discriminated against you on the basis that you got arrested and charged for a felony. And we would have done that, we would have discharged anyone who got charged with a felony under any circumstances. So that's really the basis for at least the initial firing. It had nothing to do with his service. It just was the fact that he got charged with a felony. Yes, Your Honor, and I appreciate that question, and I can answer it in two parts. Not two ways, in two parts. The first part is the statute not only protects service, or membership if you will, it not only protects the fact that you served, it also protects the performance of service. And specifically defines service to include active duty. It's undisputed my client was on active duty. But I believe, Your Honor, your question is really more driven towards the factual issue here. Why'd they fire him? The record is clear why they fired him. The testimony from Riverside's person most knowledgeable is unequivocally that on July 19th, they received a phone call from the U.S. attorney and an NCIS agent apparently that said, hey, we believe your guy did X, Y, and Z. And I can get into X, Y, and Z if the court wants, but X, Y, and Z was very factually specific to Fallujah, the Battle of Fallujah, inside of a house. But I guess what the other piece of information they got is that we are going to charge this guy with voluntary manslaughter, right? I think the record said murder. He was charged with voluntary manslaughter, but yes. He's going to be charged with a felony. We are going to charge. We anticipate we will charge. And I'm so glad you asked me that question. Because the record also very clearly reveals, if that's what they want to stand on, it's not his service, it's the fact we were told he's going to be charged. If that's what they want to stand on, we've got to look deeper into the record. Because it's also undisputed that in May of that same year, they were told by these same folks, an indictment is imminent. Now, why is that interesting? That's really interesting because in May, they didn't know the specific factual acts that were alleged to have occurred. Okay, so how does that help you? That's my whole point. They're just saying the guy is going to be charged with a felony. We have a policy, which we have applied without exception to anyone on our force, I guess at least who's in a probationary status, who gets charged with a felony, we automatically discharge them, presumably because their effectiveness as an officer is compromised, right? That seems perfectly reasonable to me. He's going to be arrested for a felony is not different than he's going to be indicted for a felony. They took no action when he was indicted. In fact, the argument would be very different if they fired him in May. Because in May, they weren't told of the specifics of his conduct. It wasn't until they were told the specifics of his alleged conduct in Fallujah that they immediately made the decision to terminate. And that also gets really interesting, Your Honor, because they weren't told his arrest is imminent. They weren't told that. In fact, it wasn't until they said, you know, we're going to fire him. They were told what he did allegedly in Fallujah. And they made the decision right there on the spot, we're going to fire this kid. And the U.S. attorney said, well, no, don't fire him. I'll lose jurisdiction if you fire him. Don't fire him. And in fact, the NCIS agent, Mark Fox's testimony is unequivocal. We had no intent, no present intent to arrest Jose Nazario in August or September of that year. And the impetus for our arrest was their decision to terminate. But focus on the charge, the charging decision. They were told that he is going to, we, the U.S. attorney's office, intend to charge this guy with a felony, right? I mean, tell me if that's disputed. I thought that was undisputed. It's undisputed that they were told what was going, what the U.S. attorney thought was going to happen in July. That did not include an arrest. What they were told in July is, here's what we believe Mr. Nazario did. And Riverside didn't just stop there and take it at face value. They pressed the issue to the U.S. attorney. They said, you know, words to the effect of, I'm paraphrasing, but hey, are you sure? This is combat. Well, and also, as you point out in your brief, it was an unprecedented charge, unprecedented charging decision. It was an unprecedented charge. I don't blame them for questioning. Are you serious? You're going to charge as a civilian, in a civilian court, with somebody for committing crime on the battlefield? Your Honor, these facts are clearly unique. This is a case of first impression, but let's look at what Your Honor just said. Yeah, he was charged. He was charged by the U.S. government. And that charge by the U.S. government specifically required that he was performing service. That was an element of the charge. The government thinks it was service. Only Riverside doesn't. I will submit to you, Your Honor, that Mr. Nazario would have loved to have adopted Riverside's position at the moment of his arrest because he could not have been arrested. This conduct was solely, this alleged conduct, remember, this man was acquitted. This man pled not guilty and was acquitted and has maintained his innocence. The sole purpose for the decision to terminate were the allegations of misconduct in Iraq. So they can't, so an employer can never take into account, under your interpretation of the statute, any conduct that occurs during the course of service? Assuming the service member is honorably discharged. Assuming the service member is honorably discharged. Your Honor, respectfully, that's not only my interpretation, that's the interpretation of Petty, the Sixth Circuit decision that looked at this very issue. And Petty said, you cannot look at their conduct in service if they're honorably discharged. And my point is that they're not. They're just looking at the fact that this guy got charged with a felony. If he had never been charged, I'm with you. That's because then they would have to figure out, okay, well, who was really telling the truth about what happened in Fallujah? But all they're saying is that he got charged with a felony. Our policy is we discharge any probationary officer who gets charged with a felony. It has nothing to do with who's right or what the specifics of the underlying conduct are, he just got charged. Okay, Your Honor, I want to apologize to you because I misinterpreted your question earlier and I want to address that specific fact. On July 19th, he wasn't charged with anything. He hadn't even been indicted at that point. There were no charges. In fact, he was not charged. An arrest warrant was not sworn until August 6th. He was arrested August 7th. So they're told about this on July 19th. It's undisputed in the record that they then coordinated with NCIS in late July to arrange for his arrest, all the while he hadn't been charged. So they can't rely on the fact that he'd been charged. All we have is an allegation. Well, but let me make sure I understand. I thought that conversation they had with the U.S. Attorney, it was clearly communicated to them that we are going to indict this guy for, I guess, I thought it was voluntary manslaughter, but you're saying it was murder. I thought that was undisputed, that they got that information and that's what prompted them to say, you know what, we're going to discharge this guy. And then in terms of the timing of the arrest, I agree. That happened later, but that was more to accommodate the, you know, the government's interest, really. Two parts. I apologize. Let me clarify. It wasn't murder. Murder's all over the brief. It wasn't murder. He was never charged, accused of, or indicted for murder. That's what I said. I thought it was voluntary manslaughter. You said it was murder. It was. No, I'm sorry. I meant to say if I didn't. I meant to say it wasn't murder. They were talking about murder as manslaughter. They said that we're going to charge this guy with a felony, namely voluntary manslaughter, right? I don't know that it got that specific on July 19th. I can't make that representation to the court. The representation to the court that I can make is that they were told what the U.S. attorney, through the NCIS, believed Mr. Nazario did in a particular house that they could never identify to John Doe victims that they could never identify four years, five years earlier on the battlefield. That's what they were told. Their response, because I took the deposition, the PMK response is we instantly made the decision to terminate. That's when we made the decision to terminate, that day. We had been told that there was something going on with Iraq as early as January. In May, we were told an indictment was imminent, but it wasn't until we were told the specifics of the service. He was going to be indicted. That he was going to be indicted. He was going to be indicted, Your Honor. They were told what he did. And what USERRA provides is if they consider the military service, if that's one of the motivating factors, it doesn't have to be the only motivating factor. They can also consider whether or not he's going to be arrested, whether or not he's going to be indicted, but if they consider this conduct, as Petty makes clear, if you consider the conduct and service, you've implicated USERRA. Now, I want to address a further thing, Your Honor, because the whole idea of why did they fire Mr. Nazario has evolved during the course of this action. It's gone from we fired him because he was arrested to we fired him because he was going to be arrested. And then we found out there was no intent to arrest him until NCIS was told by Riverside, hey, we're going to fire him. So it's sort of a what came first, chicken or the egg scenario, but it all leads to the same result. And that result is the consideration of conduct during military service, honorable military service. Let me ask you this before your time runs out, and it's getting so that he's acquitted. Correct. Back in New York. Out here, actually, Your Honor. And he applies for reinstatement or whatever it was. He applies for reinstatement. And then there's this incident with his wife. Yes, I'd like to address that briefly because I'm running out of time. How does that, how does, there they make it pretty, they seem to make it pretty clear that they don't want to reinstate him because of these allegations of spousal use and whatnot. The police officer, I mean, they're concerned. It sounds reasonable. Yes, it does. And I would submit to this court that their reasons for not rehiring him are, in a sense, more egregious than their reasons for termination. So there were allegations of domestic violence, which Riverside testified they didn't believe. There were other allegations on wire intercepts about Nazario beating people up in the city of Riverside, which again, Riverside testified they didn't believe. But what's really important is both of those factors came out, yet they continued to investigate his military service for months after both of those issues came out post-acquittal. And they submitted, I believe, a 13-page report having nothing to do with anything other than his military service. They assigned two investigators. One of the investigators' sole job was to look into his military service. And I see I'm getting close on time. I would like to reserve. Okay. Just finish your answer and then. And so again, you look at the standard. Did they consider the military service, which we say is they considered his conduct and service, which you can't do because USERA protects periods of time. Very clear in the statute, very clear in the case law. When you look into that period of time, if it's a qualified period of time, you violated USERA. They testified they considered their investigation of his service in making the decision not to rehire. Okay. You can save. I'll give you an additional minute on top of it. I'll give you two minutes for rebuttal. Thank you, Your Honor. May it please the Court. Jeffrey Raskin of Greenis, Martenstein and Richland on behalf of the city. USERA prohibits adverse actions based on the fact of service. And at most, it prohibits consideration of conduct that itself constitutes performance of duty under competent authority. What does that mean? I'm sorry? What does that mean? Wasn't he performing his duty under competent authority when he engaged in these alleged acts that gave rise to the indictment and potential charges? There's a difference between while certainly being present, that is, you are present under orders, you are fulfilling your duty, whether you are eating, sleeping, in the field, you are on duty. But that doesn't mean that all conduct during that time period is competent and is performance of duty under competent authority. So you think we're supposed to figure out what really happened in Fallujah? No. What I'm saying is that And how are we supposed to resolve whether, in fact, under your definition of competent authority, he was actually, was or was not operating under competent authority? First of all, there's multiple possible definitions that we have put forward. The first of which is you would never get into this issue of conduct during service. That performance, that service means the fact of service. When an employer considers the fact that you needed to take time off in order to serve, when an employer considers the fact that you served in an unpopular war, that is what Congress intended to protect against. That is what is consistent with the language, what is consistent with the explicit statutory purpose, what is consistent with the legislative history. Well, I guess, listen, I mean, if I were, I think the purpose of the statute is to encourage folks to enlist in military service, not having to worry about whatever they do in the course of that. That service is going to come back to bite them in the civilian employment. Provided they're honorably discharged. Right. And so, I mean, all kinds of, you're put in all kinds of very ambiguous situations as a combat soldier, certainly. It seems to me strange that we would have courts trying to figure out long after the fact. I mean, this is years later, whether, in fact, you know, the circumstances under which this soldier killed somebody, just because people later now are saying, well, maybe it really should be considered murder because of X, Y, and Z. I don't think Congress wanted us to wade into that morass and figure out who was right. I don't think Congress intended you to wade into it either. But the question is whether an employer is allowed to consider that. And if the employer determines that that is a reason, if the employer is not considering the fact of service or not considering some specific act that is itself performance of duty, criminal conduct is very clearly not under competent authority, is clearly not performance of service. When Petty makes alcohol under his bed during off hours, that might be during a period of service, but it is not performance of duty under competent authority. So how about when they go out and smoke marijuana? I'm sorry? How about when the soldiers go out and smoke marijuana? If it's relevant, I suppose it's certainly something that can be considered. But in the same extent, it makes no sense that Congress would have intended that we need to hire school bus drivers who are accused and, in fact, convicted of drunk driving, of domestic violence shelters, needing to hire people who admit to committing sexual abuses during this period. Let's say he had never been charged. Okay? He's honorably discharged, but, hey, years later, allegations begin to surface that maybe what he did in Fallujah wasn't on the up and up. You're saying that you could, as the city, could take that into account, notwithstanding the fact that he had never been charged and he had been honorably discharged? I think if they reasonably, if they honestly believe that he did engage in this conduct and if it is something they are not considering this because it is something that is... ...occurred during the course of military service. That's the problem, it seems to me. But a homicide is not something that can only occur during the course. But we don't know. We're never going to be able to figure out, us sitting here right now, the district court sitting on, you know, ruling on the motion for summary judgment. We're not going to be able to figure out what really happened. And I don't, that's what I'm saying. I don't think Congress wanted us to... It's true. You don't need to figure, but you don't need to figure out what really happened. An employer who honestly believes that this happened, his motivating factor is that. It may be wrong, but his motivating factor is that belief. It does not make his motivating factor the fact that the individual served in the military, that he served in Iraq, nor that he killed people under normal combat situations that are entirely lawful. If the employer is wrong, that is not discrimination. The motivating factor is still something that is not performance of service. All right. Let's say that I'm not persuaded by that. Can you address the other theory that I put out? And just very specifically, so on July 19th, when you have the conversation, is the city told that he's going to be indicted? I don't think they used the word indicted. I think they certainly were told that he would be arrested, he would be charged, he would be sentenced, and he would be facing a life sentence. That much is certainly in the record. And, yes, I think when the motivating factor is an arrest, an arrest that, you know. Well, he wasn't arrested until later, after he got fired. That's true. But when they're told that the arrest will happen, at that point, if it is, at that point, it's entirely reasonable to act. There's no reason to wait for the actual arrest. But, in fact, they decide, fine, we will wait for the arrest to happen. The motivating factor, Your Honor is right, is the arrest, the upcoming arrest that has been promised that will occur. I suppose that, to be fair, it does perhaps change the analysis of the rehire claim. At that point, you no longer have to believe Mr. Nazario. If one of the motivating factors was the Fallujah incident, it is no longer the arrest. I suppose it could be the trial for it. No, I assume that the rehire decision was predicated, as I understand it, the actual decision-maker predicated on, explicitly said, I'm not going to consider what happened to Fallujah. I'm going to consider these other things that Judge Ayers made. Correct. He used the word he's considering this to the extent of he's looking at everything in the record before him. But he then is saying, I set it aside, and it is not a basis for my decision. The basis is these statements on the wire intercept about how he believes that police officers can conduct themselves. The rehire decision doesn't seem to me to be nearly as problematic as the initial decision to fire him. So I guess I'm not quite sure I hear where you're coming out. So are you saying that the record does not support finding that it was the knowledge that he was going to be charged with these offenses, that that was the motivating factor? No, that certainly is the record. I think that is undisputed in the record. And is it the case that the city had a policy of firing all probationary officers who ended up getting charged with a felony? Yes. While it had never happened before that a probationary officer had did this, the record is undisputed that that is the policy. It's also undisputed that all tenured officers, people who actually have much more procedural rights, have uniformly either been fired upon being arrested, not convicted, arrested, or have retired or resigned in lieu of termination. So could you go back to your original argument, which was So you were trying to advance an argument from the employer's perspective. I'm sorry. You stood out before Judge Watford offered this other way of looking at what happened here. You offered your own interpretation of USERRA. Yes. It's our position that USERRA was designed to protect, discriminate, prevent employers from considering the fact that somebody has served. Just service, just the fact of service. And it's different than membership that, you know, and principally where this arises is the primary rationale for having USERRA and for having all of its predecessors the understandable concern that when people take off time in order to serve in the military, employers consider that absence, that fact of service, the presence someplace else in order to serve against the employee. That is what the types of discrimination that Congress was concerned about. That is the type of disadvantage to civilian employment that normally results. What does the phrase under competent authority add to your argument or to his argument? What does that mean? What does that do? Well, under one interpretation, closer to what Mr. Nazario has asserted, all of this means duty, that you are on duty. But that's very different than having the connective tissue of when the motivating factor is the consideration of anything that occurred during service, anything that occurred during performance of duty under competent authority. That's the piece that appears in, say, the Mr. Nazario makes a competent authority argument based on the Purple Heart Regulation. And that regulation uses that temporal language that the injury occurred while or during service under competent authority. How do you deal with 4304? Because I just, to me, that provision is just inconsistent with your conception of the statute. 4304 is an on and off switch that tells you when you, Sarah, when you, Sarah's rights apply and do not apply. The regulations term, connect it directly and, in fact, to the reemployment sections and say that reemployment rights are automatic, but when you are dishonorably discharged or receive one of these other types of discharge, you are no longer automatically entitled to this. And in the discrimination context, it, too, would alleviate any requirement that, that you withhold from engaging in the prohibited types of discrimination. So an employer could look directly in your eye and say, you are a Marine. I do not like Marines. I do not want to hire Marines. I unfortunately have to sometimes, but happily in this situation, I do not have to. But it does not, 4304 does not purport to tell you what service means or tell you what performance of service means. I read it as saying we don't want courts trying to figure out whether this period of service is going to count because this person supposedly did something that's reprehensible. We're going to peg it on what the military folks decide, and if they honorably discharge him, then that whole period of service, you're not going to get to come in and second guess whether what he did was wrong or right. Well, I mean, certainly the period of service, I agree with you, does, you know, is beyond consideration. But not what is done during the period of service. When you consider the fact that somebody served, particularly when somebody takes leave in order to serve for a period, certainly that is beyond something that you can consider. But nothing in the definition of service, nothing in the definition of, in 4311's discussion of the prohibited bases, say that what you're talking about is everything and anything that occurs, criminal conduct, sexual harassment. You call up a coworker and start sexually harassing them. You start, during a period of military leave, you start selling trade secrets of the company. These are immune. And nothing suggests that Congress intended to wall off these things that can be considered regardless of whether the person was in the military or not. This effectively is turning USERRA's anti-discrimination provision into a preferential treatment statute that does not appear to be what was ever contemplated. Certainly nothing contained in the legislative history. Nothing contained expressly in the statute. And 4304 does not specifically say if, once these things occur, the consideration of anything during this time period would be considered discrimination based on performance of service. Well, I mean, that's why I'm willing to grant you that if the termination is pegged on him being charged, that's one thing. But, I mean, you want us to interpret the statute to say even if he hadn't been charged, you could still completely second guess? I mean, the military never brought any charges against the guy. I think certainly if he was never charged but he came into the employer and freely admits that he did these things, then it seems difficult to imagine why an employer wouldn't be allowed to consider that to the same extent that it considers it for every other employee who does essentially a similar crime, a similar problematic act in any type of context. Yeah, but the difference is if he admits it. Yeah, I murdered however many innocent Iraqis. Okay. Well, that's fine. We don't hire murderers. But he's not admitting that. That's the whole problem. We don't know what happened. And we can't – I just don't think Congress intended us to try to figure out whether in fact he committed murder or whether he was doing his job as an active duty military. I understand what Your Honor is saying. The problem is at some point now we have – we've created an exception for when the person admits it. And USERA doesn't reflect any such thing that if he was – if the test really is whether he was honorably or dishonorably discharged, and that is the only consideration, then if he walks in and freely admits it, the fact that a court doesn't need to analyze it doesn't change the fact that USERA doesn't create this admission exception. It's because it has to be that all of this type of conduct is beyond the scope of USERA, that it was never intended to be interpreted this way. Okay. Any other? Okay. Thank you. Thank you, counsel. Thank you, Your Honors. I want to lean right into it. You've got two minutes. Petty admitted to the wrongful conduct. Admitted to the wrongful conduct. Standard he just put forth. Yet Petty court still said there was still concern regarding Petty's, and I quote, wrongful conduct and service. They pointed to a single line in an email from the police chief in the Petty case that said, we need to look into what he did while serving in the military as a captain. Petty said you can't look into conduct and service. And, Your Honor, I want to address something very specifically to you, and I appreciate all the questioning here. If the imminent charge of a felony was enough to fire him, they could have fired him in May before they knew any of the facts about his conduct and service. Instead, they continued to, on their own, investigate the conduct and service. There's testimony from Chief Blakely that said, you know what, after we were told in May that an indictment was imminent, I went back and I looked at his file. And what did I find? I found commendations of his service during battle. They looked into his conduct and service. That's what they're holding against them. They did not terminate him when they were told of imminent charges. I also want to address just briefly, Your Honor, the whole wire set and the domestic violence issues. Had they decided not to rehire him at the moment the domestic violence issues, which again, they testified they didn't believe, but had they decided to terminate him at that point, we would have a very different argument here. They didn't. They continued to investigate nothing but his military service for weeks thereafter. They created a 13-page report about nothing but his military service. But as I understand it, the captain or whoever it was who said I didn't believe the charges, he just said, look, I'm suspicious whenever allegations of domestic violence arise in the course of a divorce, you always have to sort of be a little suspicious. But he said later, when I did finally make the decision not to reemploy him, a court had entered some kind of more permanent, I don't know if it was like a restraining order or what, against Mr. Nazario. And at that point he said, well, okay, the court has had a chance to look at this after he had a chance to defend against it and has imposed that restraining order. So at that point he was willing to credit it. But I don't think there's any evidence that at the time he made the decision not to rehire that he still didn't believe the domestic violence allegations. And that's not all that has to be before him. All that has to be before him is did you consider the military service? Did you consider the conduct during service in addition to these other things? It doesn't have to be the only thing you considered. And Petty says you cannot do that. And at a minimum, despite what the testimony was, we have a 13-page report at a minimum that creates a triable issue of fact as to the motivating factor behind the decision not to rehire, particularly in light of the testimony that we didn't believe these allegations. You're over your time. Thank you, Your Honor. Thank you. The matter of Nazario v. City of Riverside is submitted at this time. Thank you, Counsel. We appreciate your arguments.
judges: Conlon, Paez, Watford